**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 16-CR-67 (KBJ)** |
| | : | |
| **v.** | : | |
| | : | |
| **NEIL STEWART,** | : | **SENTENCING:  OCTOBER 27, 2016** |
| **Defendant.** | : | |

<u>**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**</u>

     The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby submits the following memorandum to assist the Court in issuing an appropriate sentence in this case.  For the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of incarceration at the bottom of the sentencing guidelines, to be followed by 120 months of supervised release, with the conditions recommended by United States Office of Probation, including that the defendant undergo intensive sex offender treatment and drug treatment, the defendant's computer and internet usage be monitored, and the defendant's direct contact with minors be limited and supervised.  The defendant is required by statute to register as a sex offender for a minimum period of 15 years.

I.       <u>**BACKGROUND**</u>

    A.     **Statement of Offense**

     Leading up to October 7, 2015, District of Columbia Metropolitan Police Department Detective Timothy Palchak had been acting in an undercover capacity as part of a multi-jurisdictional FBI/MPD Child Exploitation Task Force, operating out of a satellite office in Washington, D.C.  In that capacity, Detective Palchak ("UC") posted an advertisement in a predicated area of an online website for classified advertisements which, based on the UC's experience and information gathered from other sources, is an area of the site frequented by

individuals that have a sexual interest in children and incest.  The advertisement was intended to attract individuals with a sexual interest in children through the use of adjectives such as "taboo" and "perv."

On October 7, 2015, at approximately 6:30p.m., an individual later identified as Neil Stewart, ("defendant"), responded to an advertisement posted by the UC.  The defendant responded, "im into all the things (except scat and piss) 240 434-6898."[1]  The undersigned emailed the defendant back stating, "you like yng incest?"  The defendant responded, "Indeed I do. Care to meet up and chat about it? 240-434-6898 name's neil."   The UC provided his phone number as well and the UC and the defendant switched to text messaging to communicate.

The defendant commenced the text exchange on October 7, 2015, writing, "Hello John, its Neil. I don't want to be too blatant about types, but family anything is great!"  The UC purported to be the father of a 9-year-old daughter and asked the defendant if he had "pics/vids?"  The defendant responded, "I've got plenty to share when we meet.  Nothing in this device."  The defendant further stated that he was interested in "willing" children between ages "5-11" and that he, "did play with my sis ages ago," which based on training and experience the UC understood to mean that the defendant had engaged in sex acts with his sister.  The defendant further stated that, "I love the taste of their pussies, I miss it so much."   The defendant indicated that he possessed images that he collected from the internet.  The defendant also informed the UC during the text exchange that he lived in "park hall. . .  Just north of the St. Mary's college."

During the text exchange, the defendant provided his KiK user name, "puff221," to the UC. The UC began communicating with the defendant via KIK on varies dates in October, November and December, 2015, beginning on October 8, 2015.  During the course of the chat

---

1  All text abbreviations and typographical errors in quoted text or messaging language are original.

the defendant expressed an interest in meeting the UC in the District of Columbia for the purpose of engaging in sexual acts with the UC's purported nine year old daughter. The defendant suggested meeting at a zoo in D.C. on October 17, 2015, for the purpose of meeting the UC and his purported daughter. The defendant stated that his girlfriend shared similar interests as him but that she likes young teens. The defendant specifically inquired of the UC, "Have you asked your girl if she'd like to play with a lady?" The UC inquired about the defendant's girlfriend, "does your girl like to watch to or does she not go that far"? to which the defendant responded, "Such interest! We'll have to meet. She watches sometimes." The defendant then asked the UC, "could you host?"

As the KiK chat continued, the defendant provided the UC advice on how to begin getting a child to "fuck," stating, "The trick is starting with really small toys and gradually moving up until something is the same size. And vibration." The defendant also proposed that that when his girlfriend was at home, "Maybe we can vid and fuck while you two play," referring to the UC and his purported daughter.

On October 12, 2015, the defendant proposed meeting on Saturday (10/17) because it was the defendant's birthday. The UC agreed to meeting the defendant, to which the defendant exclaimed, "what a bday gift that would be! Especially if [the UC's purported 9-year-old daughter] would like to play." When the UC indicated he and his daughter could meet the defendant that day, the defendant responded, "That's so hot, god I hope this is real." The defendant then asked the UC if his purported daughter had "ever seen full fucking in person" which the defendant stated he thought "could be very hot" and "Might make her [the UC's daughter] want to try more."

3

Ultimately, the UC told the defendant he was unavailable on the defendant's birthday to meet and another date in November to meet was eventually planned.

Among other things, the defendant stated in the KiK chats with the UC that he maintained his collection of child pornography on his laptop computer and that his faves "are suziq, Tara, gracel," which the UC knows to be known, identified series of child pornography. The defendant also inquired at one point whether "KiK" could be done "on a laptop?" because he would, "[r]ather not have anything on my phone."

During the course of the KiK chat, the defendant sent numerous images of child pornography. On October 8, 2015 the defendant sent an image depicting a close up shot of a prepubescent child's vagina with the child's own fingers touching her vagina.  On October 12, 2015, the defendant sent the UC an image depicting:

- An adult woman licking a prepubescent child's vagina

- Two prepubescent female children naked with their legs spread exposing their vaginas

- A prepubescent female child inserting her finger into her vagina.

On October 13, 2015, the defendant sent the UC an image depicting a prepubescent female child licking another prepubescent female child's vagina.

On December 9, 2015, the defendant, having intermittently continued his chats with the UC, sent the UC another series of images and videos depicting child pornography, including a video depicting the penetration of a prepubescent female's anus by an adult male's penis.  The defendant also sent to the UC a video of what appears to be the same female being vaginally penetrated by an adult male's penis.

In total, over the course of the KiK chats, the defendant sent over 30 images and at least 3 videos depicting child pornography to the UC.

During the course of the KiK chats, after sending some images of child pornography to the UC, the defendant and the UC continued discussing meeting for the purpose of the defendant having sexual contact with the UC's purported 9-year-old daughter.  In November, the defendant indicated that he had, "many flash drives" and "can bring it all" for a meeting.  The defendant also proposed meeting the UC's daughter at an ice cream shop.  The defendant  arranged to meet the defendant on November 16, 2015 at a predetermined address in Northwest Washington, D.C., but then texted that he "blew a tire" that day and would not arrive that day.

Agents at the FBI sent an administrative subpoena to KiK requesting subscriber information associated with the username "puff221," to which KiK provided information linking the account with an email address of pacoprogshark@gmail.com. An Administrative subpoena was issued to Google requesting information related to this email account, to which Google responded,  providing  a  recovery  email  of  puppyprogshark@cooltoad.com  and  a  telephone number of 240-434-6898 associated with the account. An Administrative subpoena was issued to Verizon Wireless for the provided telephone number, the subscriber to which was Neil Stewart of  45677  Summer  Lane,  Lexington  Park  MD  20653  with  an  associated  email  address  of puppyprogshark@gmail.com. Further identification information obtained by FBI revealed that the defendant's date of birth is, in fact, October 17, 1984, as the defendant indicated in the chats.

The  defendant  was  arrested  pursuant  to  an  arrest  warrant  for  Distribution  of  Child Pornography on December 11, 2015 and a search warrant was executed at the defendant's home. Numerous electronic devices, including phones, computers and external storage devices were recovered.

A certified computer forensic examiner at the United States Attorney's Office conducted a preliminary review of each of the electronic devices recovered in the search warrant, and contained on those devices were well over 600 images and additional videos depicting child pornography, including the images described above. In addition, included among the images on the devices above were images depicting incest, bondage, and vaginal and anal penetration of pre-pubescent minors. The images of child pornography were located on the following devices:

1. Blu Life X8 cellular telephone
2. Asus Laptop bearing serial number C7N0BC13817928F
3. 2 16GB Lexar USB thumb drives
4. 1 PNY 16GB USB Drive
5. Lacie USB drive enclosure bearing serial number 1322101094914K
6. Motorola MB810 cellular phone bearing serial number A0000022C30DDC

### B.      Procedural Posture

The defendant was arrested on a warrant on December 11, 2015, and made his initial appearance before a United States Magistrate Judge that day. The defendant was held without bond, in which status he remains. The parties immediately began plea negotiations. The defendant pled guilty before this Court on June 7, 2016, and sentencing was scheduled for October 27, 2016.

## II.      SENTENCING CALCULATION

### A.      Statutory Penalties

The offense of Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) carries a maximum sentence of 20 years of imprisonment pursuant to 18 U.S.C. § 2252A(b)(2) if any image involved in the offense involved a prepubescent minor or a minor who had not attained 12 years of age, a fine of not more than $250,000 pursuant to 18 U.S.C. § 3571(b), and a term of supervised release – after any period of incarceration – of not less than 5

6

years or life pursuant to 18 US.C. § 3583(k).  See Presentence Investigation Report ("PSR") ¶¶ 129, 136.

In addition, there is a mandatory special assessment for each felony conviction pursuant to 18 U.S.C. § 3013(a)(2)(A).  See PSR ¶ 139.

### B. Guidelines Range

The government agrees with the calculation of the defendant's Guidelines sentencing range contained in the PSR.  See PSR ¶131.  The base offense level is 18, pursuant to U.S.S.G. § 2G2.2.  See *Id.*  The government agrees with the PSR that several specific offense characteristics apply:  the material involved prepubescent minors or minors under the age of 12 (+2); the material portrayed sadistic or masochistic conduct (+4); the offense involved the use of a computer (+2); the offense involved distribution (+2); the offense involved more than 600 images (+5).  See *Id.*  There are no additional adjustments that apply.  The defendant's adjusted offense level is 33.  See *Id.*

The defendant is entitled to a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a).  See PSR ¶ 131.  The government hereby moves to decrease the defendant's offense level by an additional level pursuant to § 3E1.1(b) because he timely notified the authorities of his intention to enter a guilty plea and thus permitted the government and the Court to preserve resources.  See PSR ¶ 9.  As a result, the defendant's total offense level is 30. See PSR ¶ 9.

The government agrees with the PSR that the defendant has a criminal history score of zero and is in Criminal History Category I.  See PSR ¶ 10.

With an offense level of 30 and a Criminal History Category I, the defendant's Guidelines sentencing range is 97 to 121 months.  See PSR ¶ 11.

III.    **GOVERNMENT'S RECOMMENDATION**

    A.    **Application of the Federal Sentencing Guidelines**

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004).  As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1).  Booker, 125 S. Ct. at 756.

In post-Booker cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  See United States v. Gall, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.").  After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a).  Id.  These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

On February 27, 2013, the Sentencing Commission released a report concerning the Guidelines for child pornography offenses ("The CP Report").  The CP Report contained

numerous observations that are relevant to a sentencing judge.  The CP Report recognized that child pornography offenses inherently involve the sexual abuse and exploitation of children, that child pornography victims are specifically harmed by the distribution of their images over the Internet, and that many victims suffer lifelong harm at know that their images are being used by offenders for sexual gratification.  The CP Report emphasized the growing problem of online child pornography communities that facilitate and validate child sexual exploitation.  The CP Report also identified many problems with the non-production child pornography Guidelines and included recommendations about how to change the Guidelines to better account for offender behavior, including through the elimination of some specific offense characteristics and the revision and addition of other enhancements.

Although the Commission has asked Congress for permission to revise the child pornography Guidelines, no changes have been made at this time.  The CP Report did not suggest that courts should ignore the current Guidelines, but instead provided a framework of factors to consider under the statute.  These factors should be considered in conjunction with the – not instead of – the existing Guidelines.  Unless and until Congress signals its intent to permit changes to the Guidelines, a sentencing court should determine a defendant's Guidelines range based on the current Guidelines.  A sentencing court should then consider the CP Report as part of its analysis of the statutory factors.

**B.    Basis for the Government's Recommendation**

Given the particular circumstances of this case, the government submits that a sentence at the bottom of the sentencing guidelines, with 120 months (10 years) of supervised release, with the specific conditions of supervision recommended by the United States Office of Probation, is appropriate and warranted in this case based on the factors in 18 U.S.C. § 3553(a).  The

recommended sentence is sufficient, but not greater than necessary, to accomplish the purposes of sentencing.

### 1.      Nature and Circumstances of the Offense

The defendant's possession of child pornography is inexcusable and wrong.     The defendant used the internet to amass a very large collection of child pornography, which he distributed to what he believed to be a father with access to a child in order to help negotiate a meeting at which he intended to sexually abuse that child.  In a limited review of the files on the defendant's electronic media, law enforcement identified thousands of images and videos depicting child pornography.

The defendant came to law enforcement's attention because he responded to an advertisement posted by an undercover detective posing as the father of a 9-year-old female child who was interested in "taboo."  The defendant responded with enthusiasm to this advertisement, indicating an interest in incest, and, more disturbingly in actually sexually abusing a child.  The defendant specifically stated that his interest was in a "willing" child between the ages of 5 and 11 with whom he could engage in sexual acts.  The defendant, in his chats with the undercover said that he collected images of child pornography from the internet and that he had "plenty to share when we meet."   The defendant referred by name to certain known series of child pornography (these series have been previously identified by the National Center for Missing and Exploited Children) as his "faves," evidencing a disturbing familiarity with the universe of child pornography available on the internet.

Over the course of several days, the defendant engaged in chats with the undercover in which he discussed making arrangements to travel from Maryland to D.C. in order to engage in sexual acts with the undercover agent's purported child.  The defendant discussed in detail the

sexual acts he intended to perform on the child, including providing the undercover detailed instructions regarding how to get a child to begin engaging in sexual acts with an adult.  In the course of the chat, the defendant indicated that he had "many flash drives" of child pornography and that he would "bring it all" to the planned meeting with the undercover and his daughter. The defendant told the undercover he would take the child for ice cream on the day of the planned meeting in order to make her more comfortable engaging in sex acts with the defendant.

While the defendant did not showed up to the planned meeting with the undercover, claiming to have gotten a flat tire that day, in order to facilitate the planning of his proposed sexual encounter with the child, the defendant sent to the undercover 30 images and at least 3 videos of child pornography.  The videos and images included depictions of prepubescent children being sexually abused, including children being sodomized and vaginally penetrated by adult men.

At the time of the defendant's arrest, a search warrant was executed at his residence, and multiple electronic devices were seized.  The defendant's voluminous collection of child pornography was housed on multiple of these devices, including his laptop, cellular phone, and multiple thumb drives, indicating the defendant had saved and transferred the collection of child pornography images across devices.

Child pornography causes real and lasting harm in our society.  It is not just about images and videos; it is about the children in those images and videos.  It is about children who are at best being treated as sexualized objects and at worst being horrifically and repeatedly sexually abused.  The abuse of child pornography victims does not end, however, when the physical contact or production of images or videos is over.  The abuse and harm go on as long as those images and videos are viewed, traded, collected, and used by offenders for sexual gratification.

This harm cannot be overstated.  Particularly in the Internet age, victims of child pornography must attempt to cope with the knowledge that the worst moments of their young lives are forever memorialized and available to child pornography consumers.  Individuals – like the defendant – who receive, seek, view, keep, trade, distribute, and use child pornography for their own sexual gratification are part of the illicit market for child pornography, which continually re-victimizes the children in already-existing images and videos and promotes the brutalization of even more children for new images and videos.

Courts have long recognized the harms posed by child pornography offenders.  As the Supreme Court recognized in the seminal case of New York v. Ferber:

> The use of children as subjects of pornographic materials is very harmful to both the children and the society as a whole.  It has been found that sexually exploited children are unable to develop healthy relationships in later life, have sexual dysfunctions, and have a tendency to become sexual abusers as adults.

> Pornography poses an even greater threat to the child victim than does sexual abuse or prostitution.  Because the child's actions are reduced to a recording, the pornography may haunt him in future years, long after the original misdeed took place.

458 U.S. 747, 758-60 nn. 9 & 10.  The Court continued, "[a] child who has posed for a camera must go through life knowing that the recording is circulating within the mass distribution system for child pornography. . . . It is the fear of exposure and the tension of keeping the act secret that seem to have the most profound emotion repercussions."  Id. at 759 n.10.

As the Fifth Circuit similarly concluded, the crimes of a "'passive' child pornography recipient" are not "somehow attenuated as compared to a person who actually produces or distributes child pornography . . . victimization of a child depicted in pornographic material flows just as directly from the crime of knowingly receiving child pornography as it does from the arguably more culpable offenses of producing or distributing child pornography."  United

States v. Norris, 159 F.3d 926, 930 (5th Cir. 1998).  After all, "the 'victimization' of the children involved does not end when the pornographer's camera is put away.  The consumer, or end recipient, of pornographic materials may be considered to be causing the children depicted in those materials to suffer as a result of his actions."  Id. at 929.

The victim impact statements of the children depicted in these images share a common theme:  the victims must cope, every day, with wondering whether someone they have come in contact with has seen the pictures or videos of their abuse.  They are revictimized – continuously exploited – by each consumer of child pornography.   The defendant's possession of child pornography is severely harmful to society in general and to the child victims in particular, and warrants a significant punishment.

### 2.       History and Characteristics of the Defendant

The defendant has no prior criminal record and has, since his arrest in this case, demonstrated a willingness to accept responsibility and plead guilty in this case.

However, there are several concerning aspects to the defendant's post-arrest conduct that the Court should consider.  First, the defendant appears to have made no efforts thus far while incarcerated to seek available treatment at the D.C. Jail.  The defendant acknowledges, for example, his problem with substance abuse and, indeed, at the time federal agents executed the arrest warrant in this case, the defendant had immediately in his possession in his living room illegal narcotics that appeared to be in use.  Nonetheless, despite recognizing in his interview with the PSR writer his need for treatment, the defendant has not only failed to seek it, but has been actively using drugs while incarcerated at the D.C. Jail.  This does not bode well for the defendant's willingness to address the many issues, including his sexual interest in children, that will certainly require treatment and rehabilitation before the defendant could responsibly be

released back into the community.  In addition, the defendant appears to have diagnosed and admitted mental health issues for which it does not appear he has been adequately treated.  These issues likewise merit evaluation and treatment before the defendant is released.

### 4.      Punishment, Deterrence, Protection, and Correction

A sentencing court "shall impose a sentenced sufficient, but not greater than necessary" to comply with the need for a sentence: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (d) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2).

The government's recommended sentence is sufficient, but not greater than necessary, to provide just punishment for the defendant's offenses.  The defendant's possession of child pornography harms society at large and specific child victims and warrants a sentence of imprisonment.  Moreover, a term of supervised release – with conditions including sex offender assessment and treatment, mental health treatment and substance abuse treatment – is important to ensuring that the defendant receives the treatment and support that will ensure he does not commit any additional crimes.

### 5.      Available Sentences

The defendant should be sentenced to a term of incarceration.  The defendant is in Zone D of the Guidelines, and thus a probationary sentence would be a departure from the Guidelines. According to the PSR, the defendant does not have the ability to pay a fine in this case.  See PSR ¶ 128.

The Court should impose a term of supervised release, and the government recommends a term of at least 120 months (10 years).  A lengthy term of supervised release is critical because it will subject the defendant to ongoing monitoring and sex offender treatment.  The conditions of supervised release should include:  sex offender evaluation and treatment, restrictions on direct contact with minors, and monitoring of the defendant's use of the Internet, computers, and any other Internet-capable devices.  The defendant's crimes stem from his online activities, specifically, the defendant's use of the internet to obtain and distribute child pornography and to seek out opportunities to engage in sexual acts with children.  The defendant's use of the Internet to commit his crimes justifies monitoring his future use.  The Court should impose all of the special conditions recommended by the United States Office of Probation in the PSR and at sentencing.

The proposed conditions surely deprive the defendant of a degree of his liberty; however, the conditions also promote achievement of the statutory purposes of sentencing.  Sex offender evaluation and treatment constitute necessary correctional treatment of the defendant. Restrictions on contact with minors and monitoring of electronic devices and the internet deter future crimes and protect the public.  The resulting deprivation of liberty is no more than reasonably necessary when weighed against the likely achievement of those purposes.

### 6.   Avoiding Unwarranted Sentencing Disparity

One of the statutory factors to consider at sentencing is the need to avoid unwarranted disparity.  Indeed, avoiding such uncertainty and disparity was one of the purposes for the creation of the Sentencing Guidelines.

Avoiding sentencing disparity poses no small task in a case of this nature, as there is much variation in how courts apply (or decline to apply) the Sentencing Guidelines in possession

15

of child pornography cases.  Indeed, the sentences imposed over the last decade within this jurisdiction vary wildly, with some courts imposing guideline-compliant sentences, including recently up to recently 108 months for a defendant whose guidelines and relevant conduct (ie., a plea to possession, but where defendant had distributed multiple images and videos to an undercover agent) were the same as those here (*see U.S. v. Daniel Fry*, 15-CR-16 (RJL)), and, occasionally, some courts imposing as little as 12 months where the guidelines range is several times that amount (*see e.g., United States v. Woodgates*, Case No. 06-CR-083 (RCL).

While the sentences vary widely, the factors that typically result in courts imposing sentences within or closer to the sentencing guidelines range include cases in which the relevant conduct includes distribution, not just possession, of child pornography or some other criminal activity, such as a violation of 18 U.S.C. §2423(b), cases where there is other indicia of a sexual interest in children or "hands on" abuse of children, cases where the defendant has a criminal history and cases where there are other indicia that the defendant is not likely to be susceptible to rehabilitative efforts.  Cases in which courts vary significantly downward from the guidelines tend to include those where the conduct is isolated and unaccompanied by other indicia of a likelihood of "hands on" abuse or other criminal activity, the defendant has no criminal history, the defendant has provided significant cooperation and/or the defendant has, of his or her own initiative, engaged in significant efforts at treatment and/or rehabilitation in advance of any order by the court to do so.

With these sorts of factors in mind, the United States believes a sentence at the bottom of the guidelines would avoid sentencing disparities.  Here, the defendant not only possessed but distributed child pornography, using his collection of images as a tool to barter for the opportunity to engage in "hands on" sexual abuse of a child.  In addition, the defendant has not

16

shown initiative in seeking treatment for his sexual interest in children or his drug or mental health issues, all of which tend to indicate that the defendant poses a continuing risk to the community.   Finally, the defendant did not engage in any meaningful attempt to provide assistance to the government or to otherwise use his time incarcerated at the D.C. Jail to better situate himself for re-entry back into the community.   Rather, the defendant continued his substance abuse while incarcerated and at the moment in time when, presumably, he recognizes it is most important for him to demonstrate to the Court his willingness to make significant changes to his conduct that would militate in favor of his return to the community.   Accordingly, the United States believes that the defendant continues to pose a risk and, having not seriously engaged efforts at rehabilitation or constructive change, should receive a guideline-compliant sentence in this case.

### 7.    Restitution

At the time of the filing of this memorandum, the government has received no restitution requests from identified victims.   Should the government receive any such requests before the expiration of the statutory period, it will submit them to the Court.

**IV.**     **CONCLUSION**

WHEREFORE, for all of the reasons set forth herein, the government recommends that the Court sentence the defendant to a term of imprisonment at the bottom of the sentencing guidelines, to be followed by 120 months (10 years) of supervised release, with the recommended conditions of supervision.  The defendant is further required by statute to register as a sex offender for a minimum period of 15 years.

Respectfully submitted,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY


___/s/_____
Andrea L. Hertzfeld
Assistant United States Attorney
D.C. Bar 494059
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7808
Andrea.Hertzfeld@usdoj.gov