# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) ) ) | **Crim. No. 16-67 (KBJ)** |
| **v.** | ) ) | |
| **NEIL STEWART** | ) ) ) ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

    Neil Stewart through undersigned counsel, respectfully submits his memorandum in aid of sentencing in support of a prison sentence of forty-eight months followed by fifteen years of supervised release.  This recommended sentence reflects the nature and circumstances of the offense, Mr. Stewart's history and characteristics, and is "sufficient, but not greater than necessary to serve the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2).

    **Background**

    Mr. Stewart was arrested on December 11, 2015 pursuant to a criminal complaint that charged him with distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2).  Later that day, Mr. Stewart was presented in Magistrate Court for his initial appearance. Pursuant to the government's request for pre-trial detention, Magistrate Judge G. Michael Harvey ordered his temporary detention and scheduled a consolidated preliminary and detention hearing for December 15, 2015.  On December 15, 2015, Mr. Stewart continued his hearing with the goal of resolving his case through a pre-indictment disposition.  Mr. Stewart continued his hearing on four separate occasions and agreed to exclude time under the Speedy Trial Act.

On June 7, 2016, Mr. Stewart appeared before the Court and entered a guilty plea to a criminal information that charged him with Possession of Child Pornography in violation of violation of 18 U.S.C. § 2252A(a)(5)(B). The conviction carries a maximum prison term of twenty years, a maximum fine of $250,000 and a term of supervised release of at least five years and a maximum of life. In the Pre-Sentence Investigation Report ("PSR"), Probation Officer Kelli Willett calculated a sentencing range of 97 to 121 months of incarceration pursuant to a final base offense level 30 and Criminal History Category I. PSR ¶ 130. The conviction requires Mr. Stewart to register as sexual offender for a minimum period of fifteen years of his life. ¶ 134. Mr. Stewart reviewed the PSR and agreed with the reported background information, sentencing calculations and statutory provisions. Mr. Stewart will appear before the Court for sentencing on October 27, 2016.

<u>**ARGUMENT IN SUPPORT FOR A PRISON SENTENCE OF 48 MONTHS**</u>

Within days of his initial appearance on December 11, 2015 Mr. Stewart arrived at the sobering realization that he could be incarcerated for the next decade of his life. If he is sentenced pursuant to the applicable guideline range, Mr. Stewart will be in his early forties when he is released from custody. The advisory penalty for his first criminal justice encounter is staggering.

Notwithstanding his current predicament, Mr. Stewart has maintained a positive outlook for the remainder of his life. Mr. Stewart's optimism is based on his desire to receive treatment for the deviant urges and addictions that have devastated his life. He is cognizant that once he is released from prison he will be on supervised release for a very long time. Supervised Release will be in addition to the requirement of sexual offender registration. Thus, when he is released

2

Mr. Stewart will still be subject to court, housing, and employment restrictions that will force him to conduct himself lawfully so that he is never a danger to children.

The paramount issue before the Court is how to balance the various goals of sentencing in imposing an appropriate disposition.  Clearly, the sentence has to incorporate a punitive component that adequately addresses the harm caused by Mr. Stewart.  The sentence should also provide Mr. Stewart the opportunity to return to society within a reasonable time frame. Pursuant to the applicable sentencing statutes and his personal history, Mr. Stewart respectfully requests a prison sentence of 48 months followed by fifteen years of supervised release.

 After spending more than ten months in the District of Columbia Jail and Central Treatment Facility, Mr. Stewart is pleading for leniency. As a first time criminal offender Mr. Stewart wants the opportunity to demonstrate a commitment to responsible and law abiding behavior.  Mr. Stewart wants to prove to the Court, to his family that he has so deeply offended, and the government that he can and will live the remainder of his life in a lawful manner. On account of the totality and circumstance of his life and pursuant to the applicable sentencing statutes and case law, Mr. Stewart respectfully requests that the Court sentence him to a period of incarceration of forty-eight months to be followed by fifteen years of supervised release.

I.    **Pursuant to *United States v. Booker*, and 18 U.S.C. § 3553(a), a Prison Sentence of Twenty-four Months followed by ten Years of Supervised Release is a Reasonable, <u>Appropriate and Sufficient Sentence.</u>**

In *United States v. Booker* the Supreme Court held that the mandatory nature of the federal sentencing guidelines system violated the Sixth Amendment of the United States Constitution. 543 U.S. 220, 226-27 (2005).  To remedy the Sixth Amendment violation, the Court excised two provisions of the Sentencing Reform Act (SRA), 18 U.S.C. § 3553(b)(1) and

18 U.S.C. § 3742(e), thereby effectively rendering the Sentencing Guidelines advisory. *Id.* at

245. The Court further held that judges are required to "take account of the Guidelines *together*

*with* other sentencing factors," and to "consider" the guidelines along with all the other required

factors. *Id.* at 224. (emphasis added).

While the Court must still correctly calculate the guideline range, *Gall v. United States*,

552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *id.* at 51; *Nelson*

*v. United States*, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be

considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v United States*, 552

U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an

individualized assessment based on the facts presented," *id.* at 49-50, and explain how the facts

relate to the purposes of sentencing. *Id.* at 53-60; *Pepper v. United States*, 131 S. Ct. 1229, 1242-

43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater

than necessary' to accomplish the goals of sentencing." *Id.* at 101; *Pepper*, 131 S. Ct. at 1242-43.

A key component of Supreme Court law, designed to ensure that the guidelines are truly

advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter

of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary

[from Guidelines ranges] based solely on policy considerations, including disagreements with the

Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United*

*States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself

fails properly to reflect § 3553(a) considerations").

The Court may properly find that the child pornography guideline was not developed

by the Commission in its characteristic institutional role of basing its determinations on empirical

4

data and national experience, *see Kimbrough*, 552 U.S. at 109-10, consistent with the Supreme

Court's repeated recognition that when a guideline was not developed by the Commission based

on empirical data of past sentencing practices and national sentencing experience, it is not likely

that the guideline "reflect[s] a rough approximation of sentences that might achieve § 3553(a)'s

objectives," and that a policy-based variance from such a guideline is not subject to "closer

review" and is "not suspect." *See Kimbrough*, 552 U.S. at 109-10; *Spears*, 555 U.S. at 264; *Rita*,

551 U.S. at 348, 349-50.

II.     **The Recommended Variance from USSG § 2G2.2 is Reasonable in View of the**
        **Debate and Critique Surrounding the History and Application of the Guideline**

U.S.S.G. § 2G2.2 of the Guidelines Manual applies to Mr. Stewart's criminal offense.

Under this section,  Mr. Stewart's base offense level is 18. § 2G2.2(a)(1). With a Criminal

History Category I, Mr. Stewart's initial guideline range is 27 to 33 months of incarceration.

However, five Specific offense characteristics enhancements apply to Mr. Stewart's case, (1) a

two-level enhancement for material involving a prepubescent minor, § 2G2(b)(2); (2) a two-level

enhancement for distribution § 2G2.2(b)(3)(F); (3) a four-level enhancement for material

portraying sadistic conduct or depictions of violence, § 2G2.2(b)(4); (4) a two-level enhancement

for the use of a computer, § 2G2.2(b)(6); and (5) a five-level enhancement for an offense

involving more than 600 images, § 2G2.2(b)(7)(D). PSR ¶ 50-55.

After applying the five enhancements, Mr. Stewart's final guideline range shoots up to a

prison range of 135-168 months. The end result is a severe sentencing recommendation that is

based on uniformity that is unfair and inconsistent with the principles of individualized

sentencing called for in 18 U.S.C. § 3553(a) and 28 U.S.C. § 991(b)(1)(B).

U.S.S.G. § 2G2.2 did not always begin with such a high base offense nor did it provide the numerous enhancements currently available.  A significant problem with U.S.S.G. § 2G2.2, is that the increase in the base offense levels and enhancements since 1991 are bereft of any analytical and systemic framework justifying the increases.  In 1991 the applicable guideline provision for "Trafficking in Material Involving the Sexual Exploitation of a Minor" was U.S.S.G. §2G2.2. The initial Base Offense Level under that provision was 13. Only three enhancements were applicable;  a two-level increase based upon the images involving a prepubescent minor, a four-level enhancement for "material that portrays sadistic or masochistic conduct, and a five-level enhancement if the offense involved distribution. *See United States Sentencing Commission Guidelines Manual* (Incorporating guideline amendments effective November 1, 1991) at 133.

The increase in enhancements and in the value of the enhancements suggests a runaway march toward a fully punitive sentencing scheme that is inconsistent with 18 U.S.C. §3553(a) and the mandate of 21 U.S.C. §991. The increases in the guideline range since 1991 do not reflect a quantum of empirical data, national experience, and independent expertise that are characteristic of the Sentencing Commission's institutional role. On the contrary a historical review of the changes in USSG Section 2G2.4 paints an unrestraint pursuit but largely unjustified goal of severe incarceration;

| | | |
|---|---|---|
| **1991 – Original Guideline** | 10 | Base Offense Level |
| § 2G2.4 | 2 | Prepubescent minor |
| | -2 | Acceptance of responsibility |
| | | **10 6-12 months** |
| | | |
| **1991 Amendments** | 13 | Base Offense Level |
| § 2G2.4 | 2 | Prepubescent minor |

|  |  |  |
|---|---|---|
|  | 2 | 10 or more items |
|  | -2 | Acceptance of responsibility |
|  |  | **15 18-24 months** |
| **1996 Amendments** | 15 | Base Offense Level |
| § 2G2.4 | 2 | Prepubescent minor |
|  | 2 | 10 or more items |
|  | 2 | Possession as a result of computer use |
|  | -3 | Acceptance of responsibility |
|  |  | **18 27-33 months** |
| **2003 Amendments** | 15 | Base Offense Level |
| § 2G2.4 | 2 | Prepubescent minor |
|  | 2 | 10 or more items |
|  | 4 | Sadistic or masochistic conduct |
|  | 2 | Possession as a result of computer use |
|  | 5 | More than 600 images |
|  | -3 | Acceptance of responsibility |
|  |  | **27 70-87 months** |
| **2004 Amendments** | 18 | Base Offense Level |
| § 2G2.2 | 2 | Prepubescent minor |
|  | 2 | Distribution |
|  | 4 | Sadistic or masochistic conduct |
|  | 2 | Use of computer for the possession of the material |
|  | 5 | More than 600 images |
|  | -3 | Acceptance of responsibility |
|  |  | **30 97-121 months** |

The arbitrary increases in the base offense levels and enhancements for child pornography crimes have been the subject of debate and criticism at the district and circuit court level. The Third Circuit in *United States v. Dorvee*, 604 F. 3d 84, 96 (2nd Cir. 2010) took a critical view of the recurrence of the same enhancements and the unfairness that results from sentencing uniformity when the same enhancements are applied ("Consequently, adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute pornography for

pecuniary gain and who fall in higher criminal history categories.")

Enhancements, of course, come on top of what has been an increase in the base offense level from 13 to 22, which was, not the result of any research or empirical evidence, but the result of the Sentencing Commission's attempt "to square the guidelines with Congress's various directives." Id. The court in *Dorvee*, also noted that many of the changes directed by Congress were openly opposed by the Sentencing Commission:

> The Commission has often openly opposed these Congressionally directed changes. For instance, the Commission criticized the two-level computer enhancement (which is currently set forth at § 2G2.2(b)(6) and was adopted pursuant to statutory direction) on the ground that it fails to distinguish serious commercial distributors of online pornography from more run-of-the-mill users. See United States Sentencing Commission, Report to Congress: Sex Offenses Against Children Findings and Recommendations Regarding Federal Penalties, June 1996, at 25-30, available at http://www.ussc.gov/r_congress/SCAC.PDF (last visited [*29] April 15, 2010). n7 Speaking broadly, the Commission has also noted that "specific directives to the Commission to amend the guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress." See United States Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform, 2004, at 73, available at http://www.ussc.gov/15_year/chap2.pdf (last visited April 15, 2010).

Id. at 95-96.

This view was underscored by former United States Sentencing Commissioner and Federal District Court Judge William K. Sessions III. In "*At the Crossroads of the Three Branches: The U.S. Sentencing Commission's Attempts to Achieve Sentencing Reform in the Midst of Inter-Branch Power Struggles*,"  Judge Sessions took aim at the congressional measures that have undermined fundamental fairness in sentencing defendants like Mr. Stewart. According to Judge Sessions,

"The PROTECT Act was one of several specific directives from Congress that, along with a growing number of statutes requiring mandatory minimum prison sentences, were designed to increase punishment, restrain judges' sentencing discretion, and afford prosecutors more power over sentencing. As a result, the sentencing guidelines have become increasingly more severe." Id at 3.

The Sentencing Commission also weighed in on how the Protect Act had far reaching sentencing implications that were unprecedented. In a comprehensive report on child pornography, the commission concluded that

"The PROTECT Act made several changes with respect to the child pornography guidelines and contained provisions by which Congress, *for the first and only time to date, directly amended the guidelines*. The PROTECT Act also provided general directives, created a five-year mandatory minimum for trafficking and receipt, raised the statutory maximum for trafficking and receipt from 15 to 20 years and for possession from five to ten years,  and amended the prefatory language of 28 U.S.C. § 994(a)(1), which enumerates the duties of the Commission, to require that guidelines be "consistent with all pertinent provisions of any Federal statute." *United States Sentencing Commission Report: The History of the Child Pornography Guidelines. (October 2009*) at 38. (emphasis added).

In that same report the Sentencing Commission noted that, "sentencing courts have also expressed comment on the perceived severity of the child pornography guidelines through increased below-guidelines variance and downward departure rates..." Id at  54.

In the context of this ongoing multi-source critique of the fundamental flaws with the child pornography guidelines, there is no compelling reason to believe that the guideline range in Mr. Stewart's case, as determined by § 2G2.2, reflects and/or comports with the sentencing goals enumerated in 18 U.S.C. § 3553(a).  On the contrary, application of a guideline sentence to Mr. Stewart would be inconsistent with "[C]ongress' basic statutory goal—a system that diminishes sentencing disparity—[that] depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction." Booker 543 U.S.

at 250. (emphasis in the original).

    **a.**       <u>The Sentencing Commission's 2012 Report to Congress</u>

In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines.  *See* U.S. Sent'g Comm'n, *Report to the  Congress:  Federal Child Pornography Offenses* (2012) ["*Child Porn Report*"].  The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under U.S.S.G. § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability."  *Id.* at ii, 323.

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability."  *Id.* at iii, xi; *id.* at 209, 323.  It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very real victims, a genre of child pornography that previously was not widely circulated."  *Id.* at 6.  Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323.  The cumulative

enhancements addressing  the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result[] in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior."  *Id.*

In describing the varying degrees of culpability, the Commission reported that the "typical" child pornography case now involves images depicting "prepubescent children engaging in sexually explicit conduct."  *Id.* at 84.  Some offenders "acquire enormous and often well-organized collections," sometimes up to hundreds of thousands of images; some "intentionally collect child pornography depicting the sexual torture of children, including infants and toddlers," *id.* at viii, 84-92; and some have collected material over "a series of decades" beginning in the pre-Internet era, *id.* at 80.  The variety of images readily available on the Internet and found in offenders' possession ranges from "legal but sexually suggestive poses" to extremely graphic images "depicting violence, humiliation, bondage, and bestiality."  *Id.* at 80-81, 90-91.  Some offenders "are very discriminating" and limit their collection by preference. *Id.* at 81.  Offenders "vary widely in their technological sophistication," with some relatively unsophisticated offenders using widely available peer-to-peer to receive or distribute material "in an indiscriminate manner," while others "use their technological expertise to create private and secure trading 'communities' and to evade, and help others evade, detection by law enforcement."  *Id.* at viii, 61-62.

The Commission reported that approximately one quarter of federal offenders "received child pornography from commercial websites, thereby fostering the commercial markets," and one quarter engaged in "personal distribution" to another individual through bartering or trading of images, also described as a "market."  *Id.* at 98-99.  There is, however, no social science

11

research available to support the theory that criminal punishments "have affected commercial or non-commercial 'markets' in child pornography since the advent of the Internet and P2P file-sharing." *Id.* at 98.

The Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life." *Id.* at 79. It reported that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant,'" *id.* at 278 & n.31 (quoting Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

The Commission reported that "not all child pornography offenders are pedophiles or engage in other sex offending." *Id.* at 104. Approximately one in three offenders sentenced under § 2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior," criminal or non-criminal, past or present, based on allegations in PSRs, arrests, and convictions. *Id.* at ix-x, 204-05. However, "the current guideline measures for offender culpability (e.g., for distribution of child pornography, number of images possessed, possession of sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204.

The Commission concluded that "[t]he current sentencing scheme in § 2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." *Id.* at xx; *see also id.* at 321. The Commission asked Congress to enact

legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." *Id.* at xviii, 322.

The Commission recommends that the specific offense characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (e.g., the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting  behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and  "to reflect offenders' use of modern computer and Internet technologies." *Id.* at xviii-xix, 322-23.

The Sentencing Commission itself has acknowledged that U.S.S.G. § 2G2.2 is not the product of "empirical data and national experience" but instead a response to the creation of mandatory minimum sentences and specific congressional directives. *United States Sentencing Commission, Fifteen Years of Guideline Sentencing*, at 73 (Nov. 2004) ("frequent mandatory minimum legislation and specific directives to the Commission to amend the Guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress")

The *Dorvee* Court is not alone in pointing out the inherent problems with U.S.S.G. §

2G2.2[1].  A common denominator in the critique of U.S.S.§ 2G2.2 is the fact that it was not promulgated in a manner consistent with the approved practices of the Sentencing Commission. At the District Court level, the critique has also focused on the fact that U.S.S.G. § 2G2.2 does not adequately reflect important distinctions in levels of culpability among defendants convicted of shipping or transporting images containing child pornography[2].

Because U.S.S.G. § 2G2.2 does not reflect the Sentencing Commission's unique role of relying on evidence and study to develop sound sentencing practices, and produces advisory sentencing ranges that are far greater than necessary to serve the statutory purposes of federal sentencing, courts throughout the country—and in this District—accord U.S.S.G. § 2G2.2 less deference than empirically based guidelines.

The application of  § 2G2.2 and the corresponding final base offense level of 30 to Mr.

---

[1]     *United States v. Henderson*, 649 F.3d 955, 959-60 (9th Cir. 2011)("[T]he child pornography Guidelines were not developed in a manner 'exemplify[ing] the [Sentencing] Commission's exercise of its characteristic institutional role,' . . . so district judges must enjoy the same liberty to depart from them based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in Kimbrough."); *United States v. Stone*, 575 F.3d 592, 608-09 (1st Cir. 2009) ("[O]ur precedent has interpreted *Kimbrough* as supplying this power even where a guideline provision is a direct reflection of a congressional directive," including the career offender, fasttrack, and child pornography guidelines); *United States v. Halliday*, 672 F.3d 462, 474 (7th Cir. 2012)(district courts are "at liberty to reject any Guideline on policy grounds").

[2]     *See Grober*, 595 F.Supp. 2d 382, at 397 (using the offense characteristics "to enhance the base offense level [of § 2G2.2] is irrational because logically and factually, the characteristics are simply not genuine aggravating factors. Rather, they are inherent in just about any downloading offense"); *U.S. v. Hanson*, 561 F. Supp. 2d 1004, at 1009 (Noting the increase in Congressionally directed amendments to increase the base offense level and Special Offender Characteristics destroys the distinction between "true peddlers of child pornography and more simple possessors or transporters,"); *United States v. Baird*, 580 F. Supp. 2d 889, 895 (D. Neb. 2008) )(Analyzing the problem with Congressionally directives that result in a guideline that fails "to adequately reflect those important distinctions in levels of culpability" among defendants sentenced pursuant to 18 U.S.C. §2252A)

Stewart's crime should cause concern because it promotes sentencing disparity, unfairness at the price of "sentencing uniformity."  As a first time sex offender, Mr. Stewart is facing a prison sentence of eight (8) years to ten (10) years in prison. This range does not comport with fairness and common sense in the absence of any evidence that Mr. Stewart has had any sexual contact with a child.

Since application of USSG § 2G.2 fails to distinguish between more serious offenders and a person such as Mr. Stewart, a sentence below the advisory guideline range of 97 to 121 months would be "sufficient, but not greater than necessary" to achieve those goals.  Mr. Stewart's personal history and the circumstances of the case suggest that he is not a predator who needs to be removed from society for more than a decade.  Accordingly,  a prison sentence of twenty-four months would satisfy the sentencing mandate of 18 U.S.C. § 3553(a).

1. **The Nature and Circumstances of the Offense and the Characteristics of the Defendant**

a.      **The Nature and Circumstances of the Offense**

Mr. Stewart's criminal conduct is concisely described in the statement of facts and in the Presentence Investigation Report. PSR ¶ 27-43. Mr. Stewart exhibited very poor, and intolerable judgement in pursuing sexual relations with an adult and a child. But it's important to recognize that no one was victimized, that there was never a child in danger of being sexually assaulted by Mr. Stewart.  Equally important is the fact that Mr. Stewart has never had sexual relations with a minor and up until the solicitation from the undercover officer he had never sought out that illegal and immoral conduct.  The irony of the intent to pursue this disturbing conduct, is that Mr. Stewart essentially lost his childhood to the frequent sexual abuse committed by older teenagers and ensuing addiction to narcotics.  The sexual abuse was compounded by the extreme poverty

and instability that Mr. Stewart experienced as a child.

      b.      **History and Characteristics of Mr. Stewart[3]**

Mr. Stewart was generally raised by his mother since his biological father left the household when he was a young child.  As a single mother Ms. Johnson struggled with physical disabilities that kept her from being employed. The disabilities have continued to this day. Mr. Stewart grew up with vague memories of his biological father. But he has vivid recollections of how his mother consistently denigrated him. As a result Mr. Stewart grew up with a deep misunderstanding of his father and why he left him and his mother. Growing up Mr. Stewart was pained by the thought that his father did not love or care for him. Unfortunately, the male parental role model was filled, and neglectfully, by Ms. Johnson's second husband.

 Mr. Stewart's abject childhood resulted from his mother's indifference to the physical and emotional abuse he suffered at the hands of his step father. As a child Mr. Stewart lived a life of fear caused by his stepfather's abrupt and violent outbursts. Mr. Stewart described to the probation officer his lingering memories of being slammed against the wall and of being spanked to the point of being bloodied. All this was taking place while his family lived a nomadic and impoverished existence.  Residing in shelter homes was a norm for Mr. Stewart and his family. The ongoing instability made it impossible for Mr. Stewart to receive the adult supervision and guidance to show him that his life did not have to be the way it was.

Because he was the second oldest child, he was tasked with supervising his younger

---

[3]      Undersigned counsel will forward separately to the Court and government counsel a Psychosexual Risk Assessment completed by Lisa Hunt, the Founder and Executive Director of the Center for Clinical and Forensic Services, Inc.  The report provides more context and details regarding Mr. Stewart's history and addresses recidivism, deterrence and treatment.

siblings and completing adult chores. Mr. Stewart is a bright, inquisitive, and friendly person. But in the harsh atmosphere created by his mother and stepfather his attributes were never channeled in a positive direction. To the contrary his age and friendly nature made him an easy target for older teenagers to manipulate and sexually abuse him. The harm he suffered made it impossible for him to be a happy and confident teenager.

Because of his quiet and responsible nature his mother never fully understood the sexual abuse that Mr. Stewart was subjected to.  Although she confirmed her suspicions to the probation officer, the fact is that she never intervened to confirm or to stop it. Needless to say the sexual and physical abuse that Mr. Stewart suffered has impacted him in a profound way.  His sexual and substance abuse addictions are logical extensions of the harm he endured as a child.  His addiction to drugs, particularly to marijuana, was  a misguided effort to deal with traumas that have never healed or been addressed.

Remarkably, Mr. Stewart gave the appearance of being a well adjusted and socially responsible teenager and young adult.  He accomplished this in spite of the abuse and distance that were pervasive during his childhood. Mr. Stewart graduated from high school while shouldering the responsibilities of the oldest sibling. He did well in school despite the traumas that he suffered at the hands of his stepfather, his older brother and the random teenagers who visited his home. It's also noteworthy that during his teenage years and twenties he never displayed any pathology or aggressions to anyone.

Instead, Mr. Stewart graduated from high school and learned the value of work while in school. Unlike many defendants, he is before the Court with a documented history of consistent employment and law abiding conduct. Throughout his life Mr. Stewart has been gainfully

employed in various capacities.  Probation Officer Kelli Willett has provided a detailed history of Mr. Stewart' employment. Mr. Stewart recalls that he has been working since he was a high school student in North Carolina. PSR ¶ ¶ 117-120.  Moreover, he has shown an impressive versatility and enthusiasm for work and an ability to succeed in distinct fields. Accordingly, there is no question regarding Mr. Stewart's productive work history and responsible behavior.

It's a sad coda that after overcoming so much Mr. Stewart will be sentenced and labeled a convicted felon at the age of 32.  Prior to the instant offense Mr. Stewart had never been inside of a jail. All that changed on December 11, 2015 when Magistrate Judge Harvey ordered his temporary detention. The nature of the charge and detention represented the nadir of Mr. Stewart's already difficult life. To his credit, Mr. Stewart has used the prolonged detention to take stock of his life and reflect on the damage he's done. In protective custody isolation Mr. Stewart connected the poverty and abuses of his childhood to his intermittent emotional breakdowns and appalling criminal conduct. By understanding why his life spiraled wildly out of control, Mr. Stewart has been able to set realistic rehabilitation goals for himself.

A critical component in endeavoring to start life anew was his resolve to enter a guilty plea.  He based his decision on the simple fact that he sought out immoral and unlawful conduct with a minor and adult. Mr. Stewart did not dispute the allegations and he was steadfast in moving forward with his life.  Instead of denying his criminal intentions Mr. Stewart immediately admitted to the illegal relations he sought in chats and phone calls.  After his arrest, he divulged to the government the extent of his criminal conduct. He also provided information of others involved in similar crimes in an effort to thwart similar conduct.

While Mr. Stewart must be held accountable for his illegal conduct, there are aspects

about his character, the criminal conduct, and his resolve that reduce the likelihood that he will

he will re-engage in future criminal conduct.  Recidivism is unlikely for a number of reasons.

First, Mr. Stewart has generally led a crime free life and has shown respect for the law and

toward his family, friends and the public.  Second, it is very significant that throughout his late

teenage years and his twenties Mr. Stewart never sought to have relations with minors.  In fact all

of his relations were with same age women and men.

Mr. Stewart's nine months of isolated detention in the District of Columbia Jail was a

very sobering experience.  For a 32-year-old who had never set a foot in a prison, Mr. Stewart

was bewildered and scared by the dramatic turn in his life.  Needless to say, detention in the D.C.

Jail made an immediate impression on him. Wearing an orange jumper and housed with violent

individuals was something that he had never contemplated.  Mr. Stewart was so intimidated and

afraid of being in the D.C. Jail that he voluntarily sought protective custody status which meant

twenty-three hour isolation. Mr. Stewart's current and only prison experience will serve as a

motivation to never return to prison after his release from serving his sentence.  More

importantly,  he knows that he will never think of harming another person for his own personal

gratification.  For someone who has lived with so much pain throughout his life, he knows that

more is expected from him for that reason alone.

### The purposes of Sentencing

**a.      The Sentence should reflect the Seriousness of the Offense**

Pursuant to18 U.S.C. § 3553(a)(1)(2)(A) Mr. Stewart's sentence must reflect the

seriousness of the offense.  Because Mr. Stewart committed a serious violation, the Court has to

punish him and strike the appropriate balance between the punitive sanction and equally

important goals of deterrence and long term goal of rehabilitation. Mr. Stewart is not facing a mandatory minimum but his guideline prison range of 97 to 121 months is significantly higher than the mandatory minimum that applies to a conviction for distribution of child pornography. The critical question is whether the requested sentence of 48 months "promote[s] respect for the Law and provide[s] just punishment."

In view of all of the facts and circumstances of this case, it's a reasonable request that Mr. Stewart receive a sentence that allows him, when he is in his thirties and fully employable, to leave prison and transition back into the community.  Mr. Stewart very early acknowledged the seriousness of his criminal conduct and immediately took responsibility for his actions. When the police arrested him,  he admitted his criminal culpability without any hesitation.  In the first meeting with his initial attorney, Jonathan Jeffress,  Mr. Stewart expressed his desire to resolve his case by admitting his guilt and accepting the consequences.  Thereafter he met with the government attorney and lead detective and divulged complete information regarding his criminal conduct.

A prison sentence of 48 months will serve as a lifelong reminder of the gravity of his criminal conduct.  The requested sentence, the term of supervised release along with offender registration for a minimum of fifteen years will proactively address and alter recidivist behavior. Supervised Release will subject Mr. Stewart to a strict supervision regimen which will include restrictions on using a computer, where he can volunteer and whether he can be in the company of minors.  These conditions are designed to protect children and to keep Mr. Stewart away from activities or associations that could lead to recidivism.  Seen in this light, 48 months of incarceration would be a sufficient sentence that is not "greater than necessary."

20

After serving his 48 month prison sentence, Mr. Stewart can try to salvage the remainder of his life without being a financial burden on society. The suggested prison sentence is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).  The sentence also sends the unequivocal message to Mr. Stewart and others that child exploitation offenses will not be tolerated.

> **b.**      **The sentence should afford adequate deterrence to criminal conduct**

The primary purpose of section 3553(a)(2)( c) is to determine the appropriate sentence that will protect the public from Mr. Stewart.  The task is to evaluate and predict the likelihood that Mr. Stewart will commit further offenses, and to determine the need to deter him in relation to the risk that he presents. Additionally, the punishment should deter others who might be inclined to engage in the behavior that has brought Mr. Stewart before the Court. There should be no doubt that a prison sentence of 48 months will serve as a tangible warning to individuals who conclude that child pornography is a victim less crime without a guaranteed prison component.

Specific deterrence as to Mr. Stewart will also be achieved through the requested sentence.  Mr. Stewart's removal from the community for 48 months will eliminate his efforts to procure child pornography, which is no more and no less than the memorialization of violence against children. Just as important he will be completely deterred from pursuing depraved relations with children.  When he is released from prison, Mr. Stewart will certainly bare in mind that the Court can easily return him to prison. Thus a prison sentence of 48 months will achieve the dual goal of instilling respect for the law while simultaneously protecting the community.

Mr. Stewart recognizes that the sexual abuse of children is unacceptable, appalling and vile. He understands that a paramount component of the sentence is to protect the most

vulnerable in our society. It is absolutely clear to undersigned counsel that pre-trial detention has had a significant impact on Mr. Stewart. Throughout his detention he has generally remained alone, and without any meaningful contact with anyone else. His isolation in the Bureau of Prison most likely will continue, and he will always be fearful on account of the nature of his conviction.  This alone will serve as a way of reducing the risk of recidivism that he may pose. Ultimately, it will be Mr. Stewart's moral appreciation to not procure images that violate, assault, or in any way harm a defenseless child that will curtail his recidivism.  While that understanding was clearly missing, that is no longer the case.

In the post-Booker era courts have taken an individualized approach to sentencing when they have a first time offender who is before the court. In *United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006) the Court noted that a sentence below that recommended by the guidelines was appropriate because prison time is more significant for a first offender and this impacts on the statutory factors of just punishment and adequate deterrence. *See also United States v. Cabrera,* 567 F. Supp. 2d 271,279 (D. Mass. 2008) (granting variance because defendants, like Cabrera, "with zero criminal history points are less likely to recidivate than all other offenders); *United States v. Cull*, 446 F. Supp.2d 961, 965 (E.D.Wis. 2006) (sentence below guidelines was appropriate when defendant had never been imprisoned before because the imposed sentence "was sufficient to impress upon him the seriousness of the offense and to deter others under similar circumstances")

Similarly, age is another factor the Court can factor in determining the adequacy of a sentence that will protect the community from Mr. Stewart.  Mr. Stewart is an older man with no criminal history; as a result, he is statistically less likely to recidivate.  Under the guidelines, age

22

was not normally relevant to sentencing.  However, in a published study the sentencing

commission noted that recidivism drops substantially with age.  *See Measuring Recidivism: The*

*Criminal History Computation of the Federal Sentencing Guidelines*, at 12-15 (2004),

("recidivism rates decline relatively consistently as age increases," from 35.5% for under age 21

to 9.5% over 50).

Likewise, a number of courts have considered this as a factor in sentencing defendants

below the advisory guidelines range.  *See e.g., United States v. Wadena*, 470 F.3d 735, 740 (8th

Cir. 2006) (where 67 year old defendant convicted of mail fraud and guidelines suggested

sentence of 18 to 24 months, proper for district court to impose probation because "Wadena's

age and recent deterioration in his health reduce the risk of re-offending"); *United States v. Holt*,

486 F.3d 997, 1004 (7th Cir. 2007) (affirming a below-guidelines sentence where the district

court's only reason for the variance was that the defendant's age made it unlikely that he would

again be involved in another violent crime); *United States v. Lucania* 379 F. Supp. 2d 288, 297

(E.D.N.Y. 2005) ("Post *Booker* courts have noted that recidivism is markedly lower for older

defendants."); *United States v. Carmona-Rodriguez*, 2005 WL 840464, at *4 (S.D.N.Y. April 11,

2005) (court imposed lesser sentence because defendant was older (55) and thus there was a

lower probability of recidivism).

 **c**. **The sentence should provide the most effective rehabilitation**

18 U.S.C. § 3553(a)(2)(D) directs the Court to consider Mr. Stewart's sentence in light of

the educational or vocational training that will support his rehabilitation.  The requested sentence

is reasonable and would most effectively support Mr. Stewart's rehabilitation.  After leaving

prison,  Mr. Stewart will be afforded the chance to re-enter his community and immediately

begin his long-term commitment to responsible and lawful behavior.

If the court grants him this opportunity, his efforts will be aided by the probation office, which is equipped to assess Mr. Stewart's overall progress and recommend sexual offender treatment.  While on supervised release, the Court will retain jurisdiction over Mr. Stewart and the authority to incarcerate him. The threat of incarceration in the D.C. Jail or federal facility will have a preclusive effect. Incarceration represents a tangible and frightening consequence that Mr. Stewart will do the utmost to avoid upon his release from custody.

A sentence that allows Mr. Stewart's to leave the BOP after four years and to begin a six month stay in a halfway house would be more than adequate to meet the sentencing purposes set forth in 18 U.S.C. § 3553(2)(a).  The recommended sentence amounts to  "just punishment" when the Court considers and takes into account 18 U.S.C.§3582.   In pertinent part 18 U.S.C. § 3582 (a) states:

> "The Court, in determining whether to impose a term of imprisonment, and if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation" (emphasis added)

Undersigned Counsel's request for leniency is premised on Mr. Stewart's efforts to lead a productive life in spite of the numerous hardships that were thrust on him when he was a young child and teenager.

## CONCLUSION

Mr. Stewart's criminal intent and the statements he made to the undercover, i.e., the "nature of the offense", are appalling and socially abhorrent.  However, the government's advocacy for a draconian penalty is essentially based on the "nature of the offense." That

approach neglects Mr. Stewart's history, his humanity, his worth, his struggles, and his many hardships;  physical, emotional financial, mental and sexual in which he exerted no control. Mr. Stewart's history is replete with instances of sexual and physical abuse that turned him into a frightened, anxious and withdrawn person.

To anchor a severe penalty based on the "nature of the offense" and empirically challenged and a suspect guideline is to disregard the venerable guidance from the Supreme Court that "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996)

Mr. Stewart has demonstrated that he is a decent and well-meaning person who made a series of terrible decisions.  Those decisions have cost him and he has begun to pay for his mistakes.  He never envisioned that his life would be so terribly sidetracked by a criminal conviction and a substantial prison term.  Clearly, Mr. Stewart is responsible for making his bed but he has learned a bitter lesson that will stay with him for the rest of his life.

The requested sentence is substantial, punitive and properly punishes the anomalous criminal behavior Mr. Stewart pursued. Just as important, the sentence takes into account the challenging physical,  emotional and mental hardships that Mr. Stewart had to accept and confront since he was a young child[4].

---

[4]     Justice O'Connor recognized in her concurring opinion in *California v. Brown*, 479 U.S. 538, 545 (1987),  that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."

On account of the totality and circumstance of his life and pursuant to the applicable

sentencing statutes, Mr. Stewart respectfully requests that the Court impose a prison sentence of

forty-eight months followed by fifteen years of supervised release.

Respectfully submitted,

A.J. Kramer
Federal Public Defender


_____/s/_____
Carlos J. Vanegas
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500